**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| Martin Winfield Odom, Jr., | ) | Case No.: 08-00576-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Richards & Sons Construction | ) | |
| Co., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 08-00118-BGC |
| | ) | |
| Martin Winfield Odom, Jr., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION ON COMPLAINT**
**TO DETERMINE DISCHARGEABILITY OF A DEBT**

**I.  Background**

The matters before the Court are the Complaint filed on May 5, 2008, and related pleadings in Adversary Proceeding No. 08-00118-BGC.  Docket No. 1, and others.  After notice, a trial was held on March 12, 2009.  Mr. Fred Richards, the plaintiff's principal; Mr. Douglas J. Centeno, the attorney for the plaintiff; Mr. Martin Odom, the defendant; and Mr. Stephen L. Sexton, the attorney for the defendant, appeared.

The matters were submitted on the testimony of Mr. Richards; Mr. Don Murphy, an accountant for Mr. Richards; and Mr. Mark Stiff, a vice-president for Mr. Odom's company; the deposition testimony of Mr. Odom; exhibits; pleadings; briefs; arguments; and the records in this adversary proceeding and Bankruptcy Case No. 08-00576-BGC-7.

**II.  Applicable Law**

**A.  Section 523(a)(2)(B)**

The plaintiff seeks to have whatever debt it is owed by the defendant to be declared nondischargeable pursuant to section 523(a)(2)(B) of the Bankruptcy Code.

Section 523(a)(2)(B) makes nondischargeable

(a)  any debt:

   (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

      (B)  use of a statement in writing--

         (i)  that is materially false;

         (ii)  respecting the debtor's or an insider's financial condition;

         (iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit **reasonably relied**; and

         (iv)  that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B).

The law in this Circuit is that a debt under section 523(a)(2)(B) is nondischargeable, "where it was obtained by a writing: (1) that is materially false; (2) respecting the debtor's or an insider's financial condition; (3) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (4) that the debtor caused to be made or published with the intent to deceive." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994).

## B.  Burden of Proof

The creditor claiming that a particular debt is not dischargeable has the burden of proving each of the elements of section 523(a)(2)(B) elements by a preponderance of the evidence. Id. If that burden is not met as to any one of those elements, the debt is dischargeable. Id. Moreover, "it is not sufficient that the 'materially false statement,' referred to in the section of the Bankruptcy Act under consideration, is untrue, erroneous, or mistaken; such statement, in order to constitute a bar to the discharge of the bankrupt, must be false in the sense that it is intentionally untrue." Hartsfield Co. v. Smith, 61 F.2d 723, 724 (5th Cir. 1932) (citations omitted).

## III.  Issue

The key issue in this proceeding is whether the plaintiff reasonably relied on the information it contends was false; although, the Court has considered all of the factors from section 523(a)(2)(B).

2

## IV.  Initial Findings of Fact

### A.  The Parties

The plaintiff, Richards & Sons Construction Co.,Inc., is an incorporated construction company involved in heavy equipment earth moving and site preparation for commercial projects such as retail centers, restaurants, schools, churches, and apartment complexes.  Its principal and owner is Mr. Fred Richards, an established, experienced businessman.

The defendant, Mr. Martin Odom, was the chief operating officer and person in control of Bellanca Paving, Inc., a smaller construction company owned by his wife. Bellanca was involved in the business of grading and paving asphalt parking lots.   Mr. Odom is also an experienced businessman.

### B.  Formation of a New Company

All of the events related to the issues in this case occurred in the spring and summer of 2007.  Most occurred in the 9 weeks or so between June 5, 2007, and the first or second week in August 2007.

In the spring of 2007, Mr. Odom and Mr. Richards met to discuss the possibility of Mr. Richards buying 48% of Bellanca for $375,000, with the prospect of joining forces to construct and operate an asphalt plant.  No decisions were made or agreements struck, except that they resolved to explore both possibilities.  With respect to the asphalt plant, Mr. Richards and Mr. Odom later met with an asphalt plant equipment manufacturer, visited a potential construction site, and talked to its owner about purchasing it.  However, at some point in the process it became obvious that Mr. Odom did not have the financial resources to participate in a project of that magnitude and that idea was dropped.

On June 5, 2007, Mr. Richards met with Mr. Don Murphy, his accountant, and Mr. Mark Stiff, Bellanca's vice-president.  Mr. Odom could not attend that meeting because his wife was having surgery.  By all accounts, the purposes of the June 5th meeting were to allow Mr. Richards to begin the process of gathering and reviewing financial information about Bellanca to help him decide whether to invest in it and to allow Mr. Murphy to review that information to advise Mr. Richards.  At that meeting, or before, Mr. Richards and Mr. Murphy received three, and possibly four, documents from Mr. Stiff.  Those were: (1) a document entitled "Bellanca Paving, Inc. Balance Sheet as of May 30, 2007" (Plaintiff's Exhibit 1); (2) a document entitled "Projects Under Contract" (Plaintiff's Exhibit 2); (3) a document entitled "Equipment 2007" (Plaintiff's Exhibit 2); and possibly (4) a document entitled "Bellanca Paving Employee List" (Plaintiff's Exhibit 2).

3

In regard to the alleged fraud under section 523(a)(2)(B), when asked to identify what statement in writing was used to defraud Richards & Sons, and what statement was relied on by Richards & Sons to its detriment, Richards said only, "exhibit 1, the balance sheet as of May 30, 2007." Unofficial Trial Transcript, March 12, 2009.[1] Therefore, the only document Mr. Richards contends was allegedly supplied to him by Mr. Odom, or at Mr. Odom's direction, that was "materially false," and upon which he "reasonably relied," was Plaintiff's Exhibit 1, the document entitled "Bellanca Paving, Inc. Balance Sheet as of May 30, 2007." As stated above, that is one of the three, possibly four, documents reviewed and discussed by Mr. Richards at the June 5th meeting with Mr. Murphy and Mr. Stiff.

Plaintiff's Exhibit 1 shows, as of May 30, 2007, Bellanca owned assets totaling $1,106,352.64. Those assets included: $554,287.91 in accounts receivable and $540,081.82 in fixed assets, which encompassed equipment and office furniture. Plaintiff's Exhibit 1 also shows, as of May 30, 2007, Bellanca owed liabilities totaling $1,063,141.19. Those included: $468,957.93 in accounts payable; $6,565.10 in credit card debt; other current liabilities totaling $445,570.23 which included a line of credit at Cadence Bank with a balance owed of $396,273.59; and $142,047.93 in long term liabilities.

When asked to state what specific financial information on the balance sheet was materially false and was reasonably relied on by him and Richards & Sons, Mr. Richards stated only, "That his payables and receivables that he was showing as Bellanca Paving were true and actual to what he expected to pay and receive over the next 30 days." Unofficial Trial Transcript, March 12, 2009.

Mr. Richards was told by Mr. Stiff at the June 5th meeting that the Cadence line of credit represented an accounts receivable financing arrangement where Cadence would loan the company 75% of any new contracts it obtained, the company would deposit money collected from accounts receivables into its checking account at Cadence, and Cadence would collect the sums that it had previously advanced from those deposits. As security, the arrangement also included that Cadence had a lien on the accounts receivables.

Mr. Richards was also told that three of Bellanca's 13 pieces of equipment were encumbered by three separate security interests that secured three distinct notes owed to Citicapital, HCA, and Key Machinery. The cumulative amount due on those notes was $70,182. He was not told, according to his testimony, that Cadence's lien also extended to all of Bellanca's equipment, including second positions on the pieces encumbered by other security interests.

---

[1] An official transcript of the trial was not produced. Material cited as "Unofficial Transcript" is as transcribed by the Court for this memorandum opinion.

4

Mr. Richards and Mr. Murphy left the meeting without making a firm commitment but intended to do additional due diligence. From the meeting, Mr. Richards and Mr. Murphy formed the opinion that overall, there was little or no equity in Bellanca because its liabilities were about equal to its assets. In contrast, its equipment appeared to be undervalued and only a few of the pieces appeared to be encumbered by any sort of security interest. Based on that evaluation, they thought that instead of Mr. Richards buying a part of Bellanca's stock, Mr. Odom and he should form a new corporation where Mr. Richards would own 52 percent and Mr. Odom would own 48 percent. The plan was for Bellanca to sell its equipment to the new company for $200,000. The new company would be known as Academy Paving, Inc. The purchase money would be used by Bellanca to pay whatever debts it had remaining after application of whatever money it received from collection of its accounts receivable. All of Bellanca's employees, including Mr. Odom and Mr. Stiff, would become employees of Academy. Ideally, the transition from Bellanca to Academy would be seamless. Bellanca would cease to do business. Academy would take over the business using Bellanca's employees and equipment.

The deal created by Mr. Richards and Mr. Murphy was apparently agreeable for the most part to Mr. Odom, although it remained tentative since, according to Mr. Richards, no firm understanding was ever reached between Mr. Odom and him about the amount of Mr. Odom's salary with Academy. No written agreement was ever executed by the parties, although a letter of intent was at some unknown point prepared by Mr. Richards' attorney. Moreover, with the assistance of Mr. Murphy, Mr. Richards, continued to perform his due diligence with respect to Bellanca's financial situation. He met with and talked with Mr. Odom, Mr. Stiff, and Ms. Joan Lovejoy, Bellanca's bookkeeper, on numerous occasions throughout June, July, and August. Sometimes Mr. Odom was party to those meetings and discussions and sometimes he was not. During this time, Mr. Richards was permitted full access to Bellanca's financial records, offices and personnel.

Mr. Odom said that he informed Mr. Richards at their initial parking lot meeting that whatever deal they might reach would have to insure that he would receive a salary of $100,000 a year, the amount he was paying himself at Bellanca. He said that Mr. Richards agreed to his demand at that meeting, but ultimately reneged. Mr. Richards denied that the subject was discussed at the initial meeting but admitted that it was a subject of ongoing discussion between them. He admitted that Mr. Odom had consistently communicated to him that he needed a salary in that amount with Academy. He said that he had "talked about giving [Mr. Odom] $100,000 but never put it in writing." Unofficial Trial Transcript, March 12, 2009 (parenthetical added). But, then, in what appears to be a contradiction, he said he, "never understood that [Mr. Odom] had to make $100,000 a year for us to do the deal, no." Unofficial Trial Transcript, March 12, 2009 (parenthetical added). As it turned out, Mr. Richards was wrong. His refusal to agree to Mr. Odom's salary prerequisite proved to be one of the primary reasons that Mr. Odom eventually withdrew from the Academy deal.

5

The parties agreed that any new jobs signed after the preliminary agreement would be performed under the Academy name where old work would continue to be performed under Bellanca. The looseness of this agreement created several problems. The evidence is that there was no definitive date when the tentative agreement was reached; therefore, there was no clear understanding of the date after which jobs were to be credited to Academy's account or performed in its name. In addition, Academy was not incorporated until July 18, 2007 and could not have performed work before that date even though it was anticipated that some work garnered by Bellanca before that was supposed to be performed as Academy. Similarly, Academy did not have a contractor's license and could not have lawfully performed jobs of over $50,000. Those would have had to have been performed under Bellanca.

The above demonstrates an understandable confusion among Bellanca's financial staff, namely, Mr. Stiff and Ms. Lovejoy, about which jobs were whose. Since Academy had not been formed when the tentative agreement was reached, and since the two companies were objectively indistinguishable, the question was which jobs were Bellanca's and which were Academy's. In reality, all jobs, whether those being performed for Bellanca's account or those being performed for Academy's account, were being performed by Bellanca's employees using Bellanca's equipment, and the bookkeeping for both companies was being done by Ms. Lovejoy, who worked for Bellanca. Moreover, for most of the relevant time period, Academy had no tax identification number, so it could not deposit money collected from jobs into its bank account. As such, funds generated by "Academy jobs" had to be put in Bellanca's bank account which was subject to a lien held by Cadence Bank. Essentially, although a separate corporation, Academy was not a de facto separate business entity except on the books.

Even now, it is very difficult to determine what jobs belonged to Academy and which belonged to Bellanca.

## C. Bellanca's Problems

Prior to Mr. Richards completing his due diligence investigation, and prior to formation of Academy, and prior to finalization of the agreement with Mr. Odom, (which technically never occurred because no firm agreement was ever reached regarding his salary), Bellanca reached a point in mid-July where it did not have cash to pay its employees or to buy materials to complete its ongoing jobs. Through his company Richards & Sons, Mr Richards stepped in and provided the necessary cash by writing a check for $10,000 to Bellanca on July 12, 2007. Plaintiff's Exhibit 6. Also on July 12, 2007, Richards & Sons permitted Bellanca to charge $6,194.01 on its account to purchase materials that Bellanca, whose credit had essentially run dry, did not have the cash to purchase. Plaintiff's Exhibit 9.

Similarly, prior to Mr. Richards' completion of his due diligence investigation, but one day after Academy was incorporated, Bellanca was again unable to pay its

employees or buy materials. Again, Mr. Richards stepped in and provided the necessary cash by writing a check for $10,000 to Bellanca on July 19, 2007. Plaintiff's Exhibit 6. Mr. Richards explained that he did not make the check payable to Academy because it had not yet obtained a tax identification number and had not opened a bank account. In addition, on July 17, 2007, Richards & Sons allowed Bellanca to purchase additional materials for $5,413 on its credit. Plaintiff's Exhibit 9.

According to Mr. Richards, on July 24, 2007, he obtained two disturbing documents from Bellanca entitled, "Bellanca Paving Inc. A/R Aging Summary as of July 23, 2007" and "Bellanca Paving Inc. A/P Aging Summary as of July 23, 2007." Plaintiff's Exhibit 10. The first document described each of the accounts receivable owed to Bellanca on July 23rd along with the age of each receivable within 30 day increments, that is, those that were current, those that were less than 30 days old, those that were more than 30 days old but less than 60, and so forth. The second document listed each of the accounts payable owed by Bellanca on July 23rd along with the age of each payable within 30 day increments.

The total of the July 23rd account receivables aging summary was $307,573.26, which was $246,714.65 less than the $554,287.91 total receivables listed on the May 30th balance sheet. Only one receivable, one for $5,046, was less than 30 days old. Accounts totaling $111,234.06 were older than 30 days but less than 60 days old. Accounts totaling $62,590.75 were between 61 and 90 days old. And accounts of $128,702.45 were older than 90 days.

The total listed on the July 23rd accounts payable aging summary is $570,090.43, which, like the balance sheet, did not include the line of credit owed to Cadence as an "account payable." That amount compared to the $468,957.93 total payables listed on the May 30th balance sheet. The majority of the accounts payable had been incurred more than 90 days prior to the date the report was prepared.

Despite receiving the July 23rd accounts receivable and payable aging summaries on July 24th, documents which Mr. Richards claims proved to him that the May 30th balance sheet was false, Mr. Richards continued, through Richards & Sons, to advance money for payroll and extend credit for materials to Bellanca. On July 26, 2007, and on August 2, 2007, Richards & Sons issued checks for $12,000 and $10,265 to Bellanca to allow the latter to make payrolls. Plaintiff's Exhibit 6. And between July 25, 2007, and August 10, 2007, Richards & Sons allowed Bellanca to charge purchases of materials on its account totaling $82,299.47. Plaintiff's Exhibit 9.

On August 2, 2007, Mr. Richards obtained two additional documents from Bellanca, entitled "Bellanca Paving Inc. Collections Report as of August 2, 2007," Plaintiff's Exhibit 11, and "Bellanca Paving Inc. Unpaid Bills Detail as of August 2, 2007," Plaintiff's Exhibit 12. He said those documents left him "devastated". He testified, "I realized that the information I had been provided to make my decisions on with was not accurate at all, I was almost devastated, couldn't believe what I was

reading." Unofficial Trial Transcript, March 12, 2009. But despite his contention that those two document also revealed to him that the May 30th balance sheet was false, Mr. Richards again allowed Bellanca to purchase $33,026.14 in materials on Richards & Sons account after he received the documents.

Even after receiving the July 24th and August 2nd Bellanca financial reports, which he described as "devastating," Mr. Richards did not terminate his relationship with Mr. Odom or abandon his pursuit of the Academy-Bellanca deal. To the contrary, with Mr. Richards' blessing and in furtherance of that arrangement, during the first week or two of August 2007, Mr. Odom moved all of Bellanca's equipment (that was not being used on jobs) to Richards & Sons yard. He also moved Bellanca's office furnishings and computer to Richards & Sons offices, and directed Ms. Lovejoy to report to work at Richards & Sons, which she did.

On Saturday of the week that those moves were made, Mr. Richards met Mr. Odom at a restaurant to resolve finally the issue of Mr. Odom's salary. Mr. Richards told Mr. Odom at the meeting that he would not agree to Mr. Odom's $100,000 salary demand but would agree for Mr. Odom to receive a $70,000 annual salary plus performance and profitability incentives. Mr. Odom objected to Mr. Richards' proposal but said that he would think it over. The following Monday, Ms. Lovejoy packed up the items she had brought from Bellanca and left. Mr. Odom told Mr. Richards that his reduced salary proposal was unacceptable, and that their arrangement was over. He then had Bellanca's equipment removed from Richards & Sons' premises. The two men have had no subsequent conversations.

On August 31, 2007, Bellanca ceased doing business. Cadence called on its line of credit, seized the money in the company's bank account, and refused to advance additional funds to Bellanca. Mr. Odom was forced to sell Bellanca's equipment for less than market value in order to reduce the debt owed to Cadence and to pay the other three lienholders. Because he had personally guaranteed the Cadence debt and the proceeds from the fire sale of the equipment were insufficient to pay it in full, he still owes a relatively small amount on that debt.

### V. Additional Findings of Fact
### and Conclusions of Law

### A. Mr. Richards Did Not Prove that the May 30th Balance
### Sheet was False or Fraudulent or that
### His Assumptions about It
### Were Reasonable

As stated above, when asked, for purposes of 523(a)(2)(B), to identify what statement or statements in writing were used to defraud Richards & Sons, and which were relied upon by Richards & Sons to his detriment, Mr. Richards said only, "exhibit 1,

Case 08-00118-BGC    Doc 19    Filed 03/08/10    Entered 03/08/10 10:57:09    Desc Main
Document    Page 8 of 30

the balance sheet as of May 30, 2007." Unofficial Trial Transcript, March 12, 2009. In contrast, Mr. Richards did not prove that anything about the May 30th balance sheet was false or that false information was intentionally put on it for the purpose of misleading either him or Richards & Sons.  In fact, there is no evidence that suggests either of those conclusions or from which any such conclusions might be inferred.

### 1.  There is No Support for<br>Mr. Richards' Contention that the May 30th<br>balance sheet Was False

When asked to state what specific financial information on the May 30th balance sheet was materially false and that Richards & Sons reasonably relied on to its detriment, Mr. Richards stated, "That his payables and receivables that he was showing as Bellanca Paving were true and actual to what he expected to pay and receive over the next 30 days." Unofficial Trial Transcript, March 12, 2009. The balance sheet, however, reflects only that on May 30, 2007, Bellanca was owed accounts receivable totaling $554,287.91.

Mr. Richards said that Mr. Murphy questioned Mr. Stiff about the numbers on the balance sheet in an attempt to determine how much money Bellanca owed, to determine how much money it was receiving, and to see whether it was worth investing in the company.

### (a)  Accounts Receivable

With respect to accounts receivable, he said Mr. Stiff said that, "As far as he knew everything there was money that was owed to Bellanca Paving." Unofficial Trial Transcript, March 12, 2009. Mr. Murphy said that he does not recall any discussion with Mr. Stiff about whether any of the receivables were collectable because Mr. Stiff did not have a list of them, only that Mr. Stiff had the balance sheet which did not provide any details about the individual receivables.

The balance sheet is neutral as to collectability and age of Bellanca's receivables.  It reflects only a total.  There is nothing on it that: (1) discusses or warrants the collectability of the receivables; (2) explains the age of the receivables that comprise that total; (3) explains whether any of those receivables were disputed or contested; (4) states that those receivables were less than 30 days old; or (5) states it was anticipated that they would be received or collected within thirty days following the June 5th meeting.  It neither suggests nor implies that: (1) the accounts were readily collectible; (2) that they had only recently been created; or (3) that collection of the same was expected soon (within 30 days or otherwise), or could soon be accomplished, or anything of the sort.

9

Moreover, according to the testimony given by Mr. Richards and Mr. Murphy, Mr. Stiff did not say that the receivables were necessarily readily or easily collectable. He did not offer any evaluation of them or offer any information with respect to the relative age of any of those receivables, or state that either he, or Mr. Odom, or Bellanca expected or anticipated receiving or collecting the money owed to Bellanca within 30 days of the June 5th meeting. And, even if he had, his verbal statements to that effect would not have satisfied the "statement in writing" requirement of section 523(a)(2)(B).

Consequently, neither the balance sheet nor any thing said by Mr. Stiff at the June 5th meeting could have misled Mr. Richards, for purposes of his burden under section 523, into believing that Bellanca's receivables were readily collectable, were collectable at all, or would without question serve to offset Bellanca's accounts payables and other liabilities.

Mr. Richards' beliefs, therefore, that the balance sheet reflected accounts receivable that: (1) Mr. Odom expected to receive over the next 30 days or 30 days from the June 5th meeting; (2) were only recently created; or (3) were readily collectable; are not supported.

### (b) Accounts Payable

The balance sheet also reflects that on May 30, 2007, Bellanca owed accounts payable totaling $468,957.93. Mr. Richards said that the only thing Mr. Stiff said about Bellanca's accounts payable was, "that to the best of his knowledge all of this information, what they had been providing to the bank, this was accurate for the financial status of the company, all of the information was disclosed." Unofficial Trial Transcript, March 12, 2009. Mr. Murphy said that there was no discussion among the three men about Bellanca's ability to satisfy payables, or when it might be able to satisfy those payables, or the age of those payables. The exception was that he and Mr. Richards indicated that, (whether to one another or to Mr. Stiff is unclear), that they needed to get more details regarding those payables since the balance sheet reflected only a total.

As discussed above, when asked to state what specific information on the balance sheet he relied on to his detriment and that he contends ultimately proved to be false, Mr. Richards stated, "That his payables and receivables that he was showing as Bellanca Paving were true and actual to what he expected to pay and receive over the next 30 days." Unofficial Trial Transcript, March 12, 2009.

The balance sheet is neutral on the subjects of the nature and age of Bellanca's payables or its ability or expectation to repay those debts. It reflects only a total. There is nothing on it that discusses: (1) the nature of each payable; (2) the ages of the payables; (3) whether any of those payables were disputed or contested; (4) whether Bellanca would or would not be able to satisfy those payables; or (5) when Bellanca, if ever, would be able to repay them. It does not suggest or imply that the payables were

10

recently created, or that Bellanca had or would have the wherewithal to repay them, or that either Mr. Odom, Bellanca, or he expected or anticipated paying or being able to satisfy the payables owed on June 5th by Bellanca within 30 days of that date.

In addition, as indicated from the testimony given by Mr. Richards and Mr. Murphy, Mr. Stiff did not say that the payables had been incurred recently. He did not offer any such evaluation; did not offer any information with respect to the relative age of any of those payables; suggest that Bellanca would or should be able to satisfy those payables in its then financial condition; or state that either Mr. Odom, Bellanca, or he expected or anticipated satisfying or being able to satisfy the payables owed on June 5th by Bellanca within 30 days of that date. Even if he had, his verbal statements to that effect would not have satisfied the "statement in writing" requirement of section 523(a)(2)(B).

Consequently, neither the balance sheet nor anything said by Mr. Stiff at the June 5th meeting could reasonably have misled Mr. Richards into believing that: (1) Bellanca's payables had recently been incurred; (2) that Bellanca had or would have the ability to repay them; (3) or, as Mr. Richards put it, the balance sheet represented "what [Mr. Odom] expected to pay ....over the next 30 days." Unofficial Trial Transcript, March 12, 2009.

Mr. Richards' beliefs, therefore, that: (1) the balance sheet reflected accounts payable that Mr. Odom expected to pay over the next 30 days, or thirty days from the June 5th meeting; (2) the payables had only recently been created; or (3) Bellanca either had or would have the ability to repay those payables whether from the collection of its accounts receivable or otherwise; were not reasonable.

### 2. Comparison of the July 23rd and August 2nd documents Does Not Prove the May 30th Balance Sheet to be False

Mr. Richards only other proof that the May 30th balance sheet was inaccurate rests with his comparison of the accounts receivable and accounts payable totals to a comparison of the accounts receivable and accounts payable totals on the records that he and Mr. Murphy were provided by Mr. Stiff on or before July 24th and August 2nd, some 6 to 8 weeks following the June 5th meeting.

Mr. Richards' theory is that Mr. Stiff gave him a fraudulent document and then, anomalously and inexplicably gave him accurate documents which revealed the fraud prior to consummation of the event that the original fraud was allegedly supposed to accomplish. Mr. Richards cannot prove that the May 30th balance was false through this theory. Mr. Odom allowed Mr. Richards free, unrestricted, and open access to Bellanca's books and records, facilities, and office personnel who dealt with, entered, organized and compiled the company's financial records. That access directly resulted in Mr. Richards obtaining a true and accurate knowledge of the company's financial

11

condition. All of this is inconsistent with Mr. Richards' claim of fraud, and proof positive that Mr. Odom never intended to mislead Mr. Richards.

### (a)  Accounts Receivable

With respect to the accounts receivable, the May 30th balance sheet showed receivables owed to Bellanca on that date of $554,287.91. Plaintiff's Exhibit 1.  By contrast, the accounts receivables aging summary dated July 23rd shows receivables owed to Bellanca on that date of $307,573.26, a dramatic decrease of $246,714.65. Plaintiff's Exhibit 10, page 1.  Similarly, according to Mr. Richards, the collections report dated August 2nd shows $271,604.10 owed to Bellanca, a decrease of $282,683.81 from the total receivables shown on the May 30th balance sheet. Plaintiff's Exhibit 11. And the accounts receivables aging summary dated August 2nd shows $253,604.10 in total accounts receivable owed to Bellanca, a decrease of $300,683.81 from the total receivables shown on the May 30th balance sheet. Plaintiff's Exhibit 13.

Mr. Richards maintains that the Court may infer the falsity of the May 30th balance sheet from the dramatic difference between the total receivables reported on it and the total receivables reported on the later documents.  The Court disagrees.  Mr. Murphy, a certified public accountant with 22 years of specialized experience dealing with small business owners primarily in the construction and manufacturing fields, had full access to Bellanca's financial records and was a witness in this matter.  Who better to explain the possibilities and probabilities of how Bellanca's total receivables could have dropped so precipitously in such a short period of time, but he did not.  Who better to explain what it meant that the total receivables shown on the subsequent documents was so much less than the total listed on the balance sheet, but he did not.  The Court will not infer anything to the contrary.

### (b) Accounts Payable

With respect to the accounts payables, the May 30th balance sheet showed payables owed to Bellanca on that date of $468,957.93.[2]  In contrast, the accounts payable aging summary dated July 23rd shows total payables in the amount of $570,090.43, an increase of $101,132.50 from the May 30th balance sheet. Plaintiff's Exhibit 10, page 2. And the accounts payable aging summary dated August 3rd shows total payables in the amount of $685,507.43, an increase of $216.549.50 from the May 30th balance sheet. Plaintiff's Exhibit 13.

Again, Mr. Richards argues that the substantial difference between the total payables on the May 30th balance sheet and the total payables shown on the two subsequent documents denotes fraud, or at least that the balance sheet figures were inaccurate.  The Court disagrees.

---

[2] That figure should not be confused with the total liabilities of all varieties owed by Bellanca on that occasion, which were much greater, that is, $1,063,141.19.

Case 08-00118-BGC    Doc 19    Filed 03/08/10    Entered 03/08/10 10:57:09    Desc Main
Document    Page 12 of 30

The July 23rd payables summary, which is roughly 43 days older that the May 30th balance sheet, explicitly reflects that $119,430.56 of those payables were less than 30 days old, which means that they did not exist when the May 30th balance sheet was produced. That fact explains why the payables total on the July 23rd document are over $100,000 more than the payables total on the May 30th balance sheet. In addition, the August 3rd payables summary, which is 65 days older that the May 30th balance sheet, explicitly reflects that $204,159.86 of those payables were less than 60 days, which means they did not exist when the May 30th balance sheet was prepared. That fact explains why the payables total on that document is $200,000 greater than the payables total on the May 30th balance sheet.

The above precludes any assumption or inference that the difference between the payables total on the balance sheet and the respective payable totals on the subsequent documents can be attributed to either inaccuracy or fraud in the May 30th balance sheet.

### (c) Additional Evidence

In his post-trial brief, Mr. Richards attests that the evidence presented at trial revealed that Mr. Stiff told Mr. Richards and Mr. Murphy that the balance sheet was inaccurate. The brief includes:

> In the first week of August of 2007, Mark Stiff (the VP of Bellanca) was questioned about the accuracy of the written information provided to Richards in June of 2007. Mr. Stiff admitted to Fred and the CPA that the information contained in the May 30, 2007 Balance Sheet given to Fred by Bellanca was incorrect in that it inflated the <u>collectable</u> accounts receivables and failed to include <u>all</u> of the payables.

<u>Plaintiff's Post-Trial Brief</u> at 4. A.P. Docket No. 18.

The Court disagrees with this interpretation as it could not find any such admission in the record. Neither Mr. Richards nor Mr. Murphy testified that Mr. Stiff specifically told either of them: (1) that the information on the May 30th balance sheet was incorrect; (2) that the accounts receivable total on the May 30th balance sheet had been inflated; or (3) that the May 30th balance sheet did not include all accounts payable owed by Bellanca on May 30, 2007. Similarly, Mr. Stiff did not so testify.

In contrast, the Court cannot locate anything in either Mr. Richards' or Mr. Murphy's testimony that indicates that either of them had a conversation with Mr. Stiff about the May 30th balance sheet after June 5th. And while Mr. Richards said that during his multitude of conversations with Mr. Stiff, Mr. Odom, and Ms. Lovejoy he "found out" this, and "learned" that, such generalities fall well short of the specific admissions that are claimed to have been made by Mr. Stiff.

13

If Mr. Richards believed that the May 30th balance sheet was inaccurate, why did he not stop advancing money and extending credit to Bellanca on July 24th, which is when he said he discovered the problem?  In contrast, after learning of the problem, he continued, through Richards & Sons, to advance money and extend substantial sums of credit to Bellanca and to pursue the Academy-Bellanca deal with Mr. Odom.  And that deal dissolved only because Mr. Odom refused to accept Mr. Richards' offer that did not include payment of Mr. Odom a salary of $100,000 a year.

### 3.  The Payroll Taxes were Listed on the May 30th Balance Sheet

Mr. Richards sought to show that the May 30th balance sheet was false because Bellanca owed delinquent payroll taxes on that date, and because those taxes were not listed on the balance sheet.  The Court does not accept these conclusions.  The balance sheet plainly contains an entry of $26,677.02 for "payroll liabilities" under the overall category for "liabilities" which is where liabilities for payroll taxes are supposed to be listed.  The fact that "payroll liabilities" are listed on a balance sheet, which term commonly includes delinquent withholding taxes, would ordinarily lead a reasonably prudent person to inquire about the nature of the "payroll liabilities" in order to determine whether they represented delinquent withholding taxes or not.  Moreover, Mr. Richards produced no proof that the QuickBooks computer accounting system used by Bellanca permitted delinquent payroll taxes to be listed in any other fashion, or that it did not ordinarily record delinquent payroll taxes as "payroll liabilities."  Consequently, Mr. Richards' failure to ask Mr. Stiff whether or not the "payroll liabilities" listed on Bellanca's balance sheet included or represented delinquent withholding taxes was fundamentally unreasonable, as was his assumption that Bellanca owed no delinquent withholding taxes because they were not listed in some other fashion on the balance sheet.

Mr. Stiff said that Mr. Murphy specifically asked him if the amount listed as "payroll liabilities" on the balance sheet was for delinquent payroll taxes and that he assured him that it was.  In addition, Mr. Murphy testified that at the June 5th meeting he determined that Bellanca was in "survival mode," which he described as, "When you're to the point to having to collect cash urgently to make payroll, payroll taxes, and pay important vendors." Unofficial Trial Transcript, March 12, 2009.  So the fact that Mr. Murphy knew Bellanca was in survival mode, should have led him to suspect that it owed delinquent payroll taxes, which, therefore, should have led him to suspect that the payroll liabilities figure on its balance sheet included delinquent payroll taxes.

Mr. Richards said that as part of his due diligence investigation he met with Mr. Stiff and Ms. Lovejoy three to four times in mid to late July.  He said that during that time, he first learned, from Mr. Murphy, that Bellanca was delinquent on its payroll taxes.  He suggests that sinister intentions should be inferred from the fact that delinquent payroll taxes were not listed on the accounts payable aging summary that he received from Mr. Stiff on July 24th.  Plaintiff's Exhibit 10.  He said that he asked Mr.

14

Stiff on that occasion specifically about the payroll taxes, who admitted that the payroll taxes had not been paid for the previous month.

In contrast to Mr. Richards' contentions, there is no proof that the taxes were not disclosed on the May 30th balance sheet or that Mr. Odom was trying to conceal the fact that Bellanca owed those taxes. Mr. Richards had been informed that Bellanca was delinquent on its payroll taxes by the "payroll liabilities" entry on the May 30th balance sheet. Moreover, payroll taxes are considered "payroll liabilities," not "accounts payable." "Accounts payable" are obligations that a business owes to its creditors for buying goods or services such as unpaid invoices, bills or statements for goods or services rendered by outside contractors, vendors or suppliers. A company has several types of liabilities and all are not considered or properly categorized as "accounts payable." That is why there are separate categories for the separate types of liabilities in the liabilities section of a balance sheet. Therefore, it is not surprising or unusual that Bellanca's payroll tax deficiency did not appear on the July 23rd accounts payable aging summary. Any inference that Bellanca's payroll tax deficiency was being hidden is not supported by non-inclusion of the same in the July 23rd accounts payable aging summary. In addition, Mr. Richards produced no proof that the QuickBooks program records or categorizes delinquent payroll taxes as "accounts payable" or reports them on a company's accounts payable aging summary.

Furthermore, the fact that Mr. Richards admits to having asked Mr. Stiff about the delinquent payroll taxes on July 24th means conclusively that he knew about them no later than that date. Consequently, there is no impact if those delinquent payroll taxes were or should have been reported on the July 23rd payables summary. Mr. Richards was aware of them and that knowledge precluded him from further relying on the opposite assumption he claims to have made from the May 30th balance sheet. Hence, even assuming for the sake of argument he did not find out about the delinquent payroll taxes until July 24th, the fact that he made those substantial cash advances and extensions of credit to Bellanca after that date, despite his knowledge that Bellanca was delinquent on its payroll taxes, proves he could not have relied in fact on any alleged misrepresentation to the contrary. And, even assuming reliance in fact, his alleged reliance on the alleged failure of the May 30th balance sheet to depict Bellanca's delinquent payroll taxes to make $104,564.47 in cash advances and extensions of credit after July 24th to Bellanca was not reasonable.

And finally, Mr. Richards testified that the document entitled "Unpaid Bills Detail" that he received on August 2, 2007, is the first document he received from Bellanca that reflects delinquent payroll taxes. Plaintiff's Exhibit 12. The Court disagrees. The May 30th balance sheet, which Mr. Richards acquired on June 5th, is clearly the first such document because it reflects that Bellanca owed "payroll liabilities" on that date, which term encompasses delinquent payroll taxes.

It appears that Mr. Richards's payroll taxes argument is that someone should have <u>told</u> him about Bellanca's delinquent payroll taxes before he found out from the

documents that he received on July 24th and even before that in his conversation with Mr. Stiff about those taxes. In contrast, the evidence is that he received ample, reasonable notice of those taxes by virtue of the "payroll liabilities" listed on Bellanca's May 30th balance sheet. That conclusion is supported by the fact that Mr. Richards is an educated, experienced and astute businessman and was represented by an accounting professional on the occasion that he received that document. Furthermore, Mr. Stiff testified that he explicitly told Mr. Richards and Mr. Murphy on June 5th about those taxes and that those taxes were represented by the payroll liabilities entry on the balance sheet. Moreover, the question of whether someone did or did not tell Mr. Richards about the taxes is irrelevant in a 523(a)(2)(B) inquiry where a written representation is essential and a verbal representation will not suffice.

Based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### B. Mr. Richards Could Not Reasonably Rely on the May 30th Balance Sheet for the Purpose of Loaning Cash and Extending Credit to Bellanca Because it was not Provided to Him for that Purpose

By all accounts, the purpose of the June 5th meeting was to allow Mr. Richards to begin the process of gathering financial information about Bellanca so that he could decide whether to invest in that company, and for Mr. Murphy to review that information so that he could advise Mr. Richards. Mr. Richards stated that the purpose of the meeting was, "To determine about investing or buying into or in some way to create a merger between Richards & Sons and Bellanca paving so that we could be a grading and paving entity, either separately or together, to see if there was a way to make it work out." Unofficial Trial Transcript, March 12, 2009. Mr. Murphy testified that the purpose of the meeting was, "To look at Fred buying into Bellanca Paving." Unofficial Trial Transcript, March 12, 2009. The purpose of the meeting then was not for Mr. Richards to obtain information so that he could decide whether or not to advance cash, or materials, or trucking to Bellanca before deciding whether or not he wanted to invest in that company. This distinction is very important because Mr. Richards contends that he relied on the information contained in the May 30th balance sheet that was provided to him at the June 5th meeting when he, through Richards & Sons, subsequently made cash advances and extensions of credit to Bellanca. Those advances occurred even before he had completed his due diligence about whether to acquire any part of Bellanca, in whatever form, and before any agreement with respect to his acquiring any part of Bellanca had been finalized or consummated. The evidence contrary to Mr. Richards' conclusions is that the purpose of the meeting was not to help him decide whether or not to loan cash or extend credit to Bellanca or to obtain information to help him make that decision.

16

Similarly, there is no evidence that the information that Mr. Richards received at that meeting was provided to him for the purpose of helping him decide whether or not to loan money, or extend credit, to Bellanca. In fact, there is no evidence that either Mr. Richards or Richards & Sons was, on that occasion, even thinking about subsequently loaning money or extending credit to Bellanca or intended to do any such thing. Despite that fact, Mr. Richards contends that he could also rely on the written information he received at the June 5th meeting, (which was supplied to him solely for his use in evaluating the prospect of investing in or acquiring a portion of Bellanca), for the purpose of determining whether to loan money and advance credit to Bellanca when it needed money to operate. The evidence is that the information was not supplied to him for that purpose. There is no evidence that Mr. Stiff or Mr. Odom intended for it to be used for that purpose or could have reasonably foreseen that it would be used for that purpose or that Mr. Richards even intended at that point in time to rely on it for that purpose. The Court must conclude that Mr. Richards' alleged reliance on it for that unintended, unforeseeable purpose was neither reasonable nor justified.

Based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### C. Cash Advance "Red Flags"

Mr. Richards said that had he known the true financial condition of Bellanca he would have never directed his company, Richards & Sons, to loan it money for payroll or allow it to charge materials on Richards & Sons' account.

As explained above, when asked to specifically state what written document forms the basis of his 523(a)(2)(B) claim, he specified the May 30th balance sheet of Bellanca provided to him by Mr. Stiff on June 5th. He said that the information on the balance sheet that he specifically relied on was the information about the accounts payable and accounts receivable. He assumed that the accounts receivable were readily collectable and less than 30 days old and would be sufficient to offset the payables and provide cash flow for the company to operate its day-to-day business while new receivables were generated. That balance sheet, however, contains no salient details about Bellanca's receivables and payables, only a total for each category.

As discussed below, there were numerous cash advance "red flags" which should have provided Mr. Richards ample reason to doubt his assessment of the accounts receivable and payables information on the balance sheet and made his reliance on that assessment unreasonable. Those "red flags" should have persuaded a reasonable man in Mr. Richards' shoes to reassess and to reject his assessment of, and reliance on, the accounts receivable and payables information on the balance sheet as a litmus for making advances to Bellanca.

17

Based on the discussions below, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### 1. The Initial Meeting

At their initial meeting in the Spring of 2007, Mr. Odom and Mr. Richards discussed two ideas. Those were: (1) the prospect of Mr. Richards purchasing 48% of Bellanca for $375,000; and (2) the prospect of their joining forces to construct and operate an asphalt plant. The discussion was general and preliminary. They did not explore detailed specifics with respect to Bellanca's finances or equipment. No written financial information was presented or reviewed.

According to Mr. Richards, Mr. Odom did not reveal at that meeting that Bellanca was having cash flow problems. In contrast, in his deposition testimony, Mr. Odom said that he specifically told Mr. Richards that Bellanca would not be able to continue much longer unless it received an infusion of cash. He said that he told Mr. Richards, "that we were not going to be able to hold on much longer, that we just had — Lanny Smart was one of the guys that like to put me out the year before because he held payment. He was supposed to pay us every 15 days, and he drug it out 45 days. And that's what got me on COD with Vulcan Materials." Odom Deposition at 67-68.

The suggestion that Mr. Odom was trying to hide that fact from Mr. Richards is implausible since the latter was an experienced, successful and astute business man, who would naturally be expected to insist on examining Bellanca's books and records before proceeding. It was, after all, not contemplated by either party that Mr. Richards would write Mr. Odom a $375,000 check without doing at least some due diligence. Moreover, there was no apparent reason for Mr. Odom to have contacted Mr. Richards unless Bellanca was having difficulty and needed cash to operate, an observation advanced by Mr. Murphy in his testimony. He stated, "the reason [Mr. Odom] came to [Mr. Richards] was because [Bellanca] needed cash to make payroll and pay some vendors." Unofficial Trial Transcript, March 12, 2009. (parentheticals added).

The revelations made by Mr. Odom in his initial face-to-face meeting with Mr. Richards constituted the first red flag which should have alerted Mr. Richards, an astute business person, to tread cautiously and not to provide financial assistance to Bellanca unless and until he had carefully and throughly examined its books and records. While he eventually conducted that research, he did it too late, that is he did not do it until after he provided Bellanca with money, materials and supplies through Richards & Sons. That assistance makes up a substantial portion of his claim for damages in this case.

### 2. Accounting Information

A second cash advance red flag involves the accounting information Mr. Richards had.

Mr. Richards denied having acquired any knowledge that Bellanca had a cash flow problem either at or directly after the June 5th meeting. He also denied having had any discussion with his accountant about Bellanca's cash flow problem either at or after the June 5th meeting.

In contrast, Mr. Murphy testified that it was apparent from the meeting, and made apparent by Mr. Stiff at the meeting to him and Mr. Richards, that Bellanca was in desperate need of cash and was likely to fold if it did not receive it soon. He said that Mr. Stiff told them that, "they were in need of cash pretty desperately, some of the vendors had cut them off, things such as asphalt, rock, and making payroll, those were things of immediate need that they had." Unofficial Trial Transcript, March 12, 2009. Mr. Murphy also said that when he left the June 5th meeting he knew that Bellanca was in trouble and going out of business if it did not get a cash infusion and that, "that was the reason they came to us they needed cash to make payroll and pay some vendors." Unofficial Trial Transcript, March 12, 2009. He also testified: (1) that Bellanca was in "survival mode" when the June 5th meeting took place because it was at, "the point to having to collect cash urgently to make payroll, payroll taxes, and pay important vendors;" (2) that the company was, "in a cash crunch when we met with them in the first meeting;" and (3) that Bellanca's being cash strapped, "was the reason he told us that he had to have this money." Unofficial Trial Transcript, March 12, 2009.

Mr. Stiff affirmed Mr. Murphy's versions of the June 5th meeting, stating that he conveyed to Mr. Murphy and Mr. Richards that: (1) Bellanca was "in bad trouble;" (2) that it would be, "tough for us to pay the bills if we didn't do something;" and (3) that, "Marty had about leveraged everything he had to keep the company operating." Unofficial Trial Transcript, March 12, 2009.

Once again, armed with the knowledge that Bellanca was out of cash and could not purchase anything on credit, Mr. Richards should have looked beyond the balance sheet to determine why Bellanca had no cash, and should have questioned his favorable yet unsupported assessment of the collectability of Bellanca's receivables. He had no reasonable basis for assuming that all were less than 30 days old or readily collectable, and his receipt of evidence that Bellanca had no cash made his continued adherence to that position doubly unreasonable. He knew or should have known that Bellanca was having a cash flow problem because it was not collecting its receivables, which should have led him to find out that many of those receivables were old and not at all collectable. His failure to do so undermines both his contention that he relied in fact on the information contained in the balance sheet about Bellanca's receivables and payables when he made the subsequent advances to Bellanca, as well as his contention that it was reasonable for him to have relied on those representations when he made those advances.

### 3. Bellanca's Needs

A third cash advance red flag involves Bellanca's needs.

Case 08-00118-BGC    Doc 19    Filed 03/08/10    Entered 03/08/10 10:57:09    Desc Main
Document    Page 19 of 30

Mr. Richards denied that he knew that Bellanca was having a cash flow problem when Mr. Odom told him that he needed cash to make payroll and when he caused Richards & Sons to write a check to Bellanca for $10,000 on July 12th for Bellanca's payroll. Mr. Richards said that he did not know Bellanca had a cash flow problem because he did not know how bad its receivables and payables had been reported, ostensibly on the May 30th balance sheet, prior to that occasion.

In contrast, it was not necessary to know the true condition of Bellanca's receivables and payables to know that Bellanca was in dire need of cash. Mr. Odom asked for cash because Bellanca did not have any. From that Mr. Richards could have readily and reasonably assumed correctly that Bellanca had no cash because it was not collecting its receivables. And if Bellanca did not have cash to make payroll or buy asphalt, then the likelihood was that it was not paying its bills either. Mr. Richards would have discovered that if he had gone to Bellanca that day and obtained the same documents he later obtained from Bellanca two and three weeks later.

Mr. Richards' failure to exercise due diligence in that regard renders his claim that he was relying on what the May 30th balance sheet said about Bellanca's receivables and payables when he caused Roberts & Sons to make that advance, and the advances that followed, unreasonable.

### 4. Mr. Richards' Spreadsheet

A fourth cash advance red flag involves Mr. Richards' spreadsheet.

In late July 2007, Mr. Richards continued to deny having any knowledge that Bellanca had a cash flow problem, even after he had already caused Richards & Sons to advance Bellanca thousands of dollars in payroll money, and allowed Bellanca to charge thousands of dollars in materials on Richards & Sons account. These event occurred, and were necessary because Bellanca did not have the cash to pay for those things itself.

Mr. Richards was asked specifically whether or not he knew Bellanca was having cash flow problems when he prepared Plaintiff's Exhibit 5, a spreadsheet showing all of Bellanca's debts and all of Mr. Odom's personal debts. The debt owed by Bellanca for delinquent payroll taxes is listed on that spreadsheet. Mr. Richards testified that he did not learn about that debt until about July 24th. As such, it appears that on that date Mr. Richards, according to his testimony, still did not acknowledge that Bellanca was having a cash flow problem. But he did acknowledge that when he prepared that spreadsheet, both Bellanca and Mr. Odom: (1) had serious financial debts; (2) Bellanca was on a cash only basis with its suppliers; and (3) Bellanca did not have the cash to pay for asphalt and other necessary materials and could not borrow any more money. However, according to his testimony, he still did not believe it had a cash flow problem because, "based on the amount of money they owed and the amount of money they were owed on the financial statement, if the money was collected, the money could be

20

paid... [so] as far as cash down the road it certainly looked like it would come in at some point." Unofficial Trial Transcript, March 12, 2009.

If Bellanca did not have a cash flow problem, it would have been able to make its own payroll and purchase asphalt and other materials without assistance from Mr. Richards. Moreover, the reason that Mr. Richards prepared Exhibit 5 was to assist him in determining how to extricate Bellanca and Mr. Odom from the debt covering them by establishing <u>payment plans</u> with individual creditors. He testified:

> I took and under due amounts totaled up how much money it would take to pay off what I considered to be the small vendors, things that were the manageable numbers, the hundreds of thousands of dollars versus the tens of thousands of dollars; to come up with a down payment just to clean out a majority of the vendors that he owed; and then looking at next two columns, some of the larger vendors that he owed lots of money to, to try to figure out a payment plan of some sort so that he could go to those vendors and propose this payment plan, so that there'd be some reasonable amount that could be paid monthly to keep them satisfied and not coming after him personally or through the company or whatever because of those outstanding debts."

Unofficial Trial Transcript, March 12, 2009.

The fact that Mr. Richards was studying creative ways to help Bellanca and Mr. Odom deal with their debts does not support his claim that he was relying on what the May 30th balance sheet revealed about Bellanca's receivables and payables during that time. Consequently, the Court cannot find that Mr. Richards was relying on the balance sheet when he caused Richards & Sons to loan cash and extend credit to Bellanca, but if he did, that reliance was not reasonable.

### 5. Conclusions from the Cash Advance Red Flags

The Court finds that Mr. Richards was, as early as June 5th and no later than July 12th, aware that Bellanca had no cash and would need substantial cash injections from Richards & Sons to stay afloat and continue its business. He knew that because of what Mr. Odom told him, what Mr. Stiff told him, and what Mr. Murphy told him. He also knew that because he was in fact writing checks to Bellanca and allowing it to charge materials on Richards & Sons credit. Moreover, he knew that the balance sheet, other than stating the cumulative total of each, revealed nothing about Bellanca's receivables and payables.

Mr. Richards' premise was that the receivables would pay the payables and the new jobs would pay the advances he was making through Richards & Sons, but he did not take any reasonable steps to determine whether the receivables were collectable when he knew that they were not in fact being collected by Bellanca. Similarly,

because Bellanca did not have any cash should have led him to accelerate and complete his due diligence before advancing anything. That would have been the reasonable thing to do, and if he had done it, he would, in his own words, have discovered the true financial condition of Bellanca and would not have given it any money or extended it any credit.

Based on the above, the Court must find that Mr. Richards' failure to complete his due diligence, in the face of Bellanca's cash problems, was unreasonable. And, based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### D. Mr. Murphy's Warning

In addition to the above, Mr. Murphy warned Mr. Richards about the potential problems.

The purpose of the June 5th meeting was for Mr. Richards to determine whether he wanted to buy 48% of Bellanca for $375,000. Mr. Richards said that after reviewing the written documents provided to them at or before the meeting, Mr. Murphy advised him that it would be unwise for him to buy into the company because, according to its balance sheet, it had no appreciable assets that could secure his investment. Mr. Murphy testified, "he was concerned because of liabilities and receivables and what not, there didn't really appear to be a lot of equity in the company, and if I was going to come up with $375k to buy 48% that based on this financial statement, you know, he'd be concerned what I'd be buying because there's not a lot of assets indicated on the financial statement." Unofficial Trial Transcript, March 12, 2009.

Essentially, Mr. Murphy told Mr. Richards that he should not buy into Bellanca, that is, become a 48% shareholder, because, according to the balance sheet, the value of its assets were roughly equivalent to its liabilities. A stockholder would not be able to recoup funds provided if there were a sale if the company failed. He and Mr. Murphy, however, formed the opinion, from their examination of the balance sheet, and the equipment list, and talking to Mr. Stiff, that there was substantial equity in the company's equipment. That's when they devised the idea of forming a new company that would buy Bellanca's equipment for $200,000 and take over Bellanca's paving business using that equipment and its employees.

Mr. Murphy's warning constituted another red flag. By giving Bellanca cash and allowing it to purchase materials on its accounts, Richards & Sons was in the same position of any other creditor. And since, as Mr. Murphy explained, there was little or no equity in the company, there would be no way for Richards & Sons to recoup that cash or collect the money to pay those accounts if Bellanca ceased doing business, which both he and Mr. Richards knew would happen if Richards & Sons did not make those advances and extensions of credit.

22

Based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### E.  The Timing of
### Mr. Richards' Due Diligence

Certainly, Mr. Richards cannot be accused of not doing thorough due diligence with respect to Bellanca; however, his timing was poor.

As part of this due diligence, Mr. Richards and Mr. Murphy met with Mr. Stiff, obtained a copy of the Bellanca's balance sheet, projects under contracts list, and equipment list, and discussed those with Mr. Stiff.  Mr. Richards testified that he did not make any decisions on June 5th based on the information he received that day at the meeting with Mr. Murphy and Mr. Stiff.  He said he had to think about the situation, consider his options, and look at other things.

Mr. Murphy testified that it would not have been prudent for Mr. Richards to have made a business decision based on the May 30th balance sheet without verifying the facts contained in it, which is the reason that he and Mr. Richards met with Mr. Stiff on June 5th and had a second meeting with him on August 6, 2007.  He said that it would be imprudent to complete the investment strictly on the May 30th balance sheet without getting more details on Bellanca's receivables and payables and doing further due diligence, which is what he and Mr. Richards did between the June 5th and August 6th meeting.  He said that due diligence is normally done and is the reasonable thing to do when one company buys another, and that he and Mr. Richards did their due diligence.

Mr. Richards discussed the matter with Mr. Murphy after the June 5th meeting. He had several meetings with Mr. Odom and Mr. Odom's office staff about what Mr. Odom personally owed and what Bellanca owed.  As a result of those conversations he prepared a spreadsheet showing all of the creditors that Bellanca owed in an effort to figure a "down payment" to clean out a majority of the small vendors and a monthly payment plan for some of the larger vendors.  He determined what Bellanca's monthly bills were so that he could estimate from that what Academy's monthly expenditures would be.  He obtained a list of Mr. Odom's personal bills so that he could determine how much Mr. Odom would need each month to pay those bills.  During mid to late July he met with Mr. Stiff three or four times at Bellanca's offices.  He questioned Mr. Stiff at those meetings and in numerous other telephone conversations about the details of particular receivables, such as whether they had been collected, whether they had been reported to the bank as collected, or when they were going to be collected.  In those conversations, he found out that a lot of the receivables had either been collected or were very old and were not going to be collected. He found that some of the payables were not on the payables list.  He began formulating a new list of payables, taking off items that had been paid and adding ones that had not.  He had his attorney draft a letter of intent which reflects a basic agreement with respect to the proposed asset purchase from Bellanca.  He continued to ask for and received additional financial

23

records from Bellanca in late July and early August. On July 24th, at Bellanca's offices, he obtained an accounts payable aging summary report and an accounts receivable aging report. On August 2nd he obtained a collections report and an unpaid bills detail reports for Bellanca and Academy. On August 3rd he obtained an additional accounts receivable aging report and accounts payable aging report for Bellanca.

At some point as part of his due diligence, Mr. Richards went to see Bellanca's account manager at Cadence Bank to check on the company's financial status. He does not recall when that was but admitted that it could have been before Academy was incorporated on July 18th. He talked on the telephone with Mr. Odom every other day for most of June and July.

Mr. Murphy said that prior to the August 6th meeting with Mr. Stiff, he obtained a complete copy of Bellanca's QuickBooks file. With that, he and Mr. Richards could review all of Bellanca's accounting records, details of all of its accounts payables and receivables, liabilities, debt payments and bank account activity. That information was discussed at the August 6th meeting. At that meeting they printed accounts payable and accounts receivable details and reviewed those lists with Mr. Stiff. They discussed which had to be paid in order to keep the doors open. They prioritized the payables list. They identified additional accounts payable that were not on that list. They estimated the amounts owed on those payables. They identified problems or uncollectible accounts receivable. And they discussed when certain accounts receivable would be collected in order to predict cash flow.

Mr. Stiff said that he talked with Mr. Richards ten or twelve times between June 5th and July 17th. He said that Mr. Richards came by Bellanca's office and sat down with Mr. Odom on a couple of occasions. He said that other than the documents that he supplied to Mr. Richards and Mr. Murphy at or before the June 5th meeting, and the QuickBooks file that he sent Mr. Murphy, he did not personally supply any additional financial information about Bellanca to Mr. Richards, but he acknowledged that Ms. Lovejoy may have. He gave Mr. Richards the name of Bellanca's loan officer at Cadence. He said that he knew Mr. Richards would take some financial information to that officer. He thinks that occurred in June but is not positive.

Mr. Richards' claim that he relied on the information which appears on the May 30th balance sheet is negated by the fact that he and Mr. Murphy did substantial due diligence in anticipation of making the Academy-Bellanca asset purchase deal with Mr. Odom. Simply put, the question is, why did he and Mr. Murphy do the substantial due diligence investigation if he felt like he could strictly rely on the balance sheet?

Further proof that Mr. Richards did not rely on the balance sheet lies in the fact that he advanced $100,000 in money and extensions of credit to Bellanca through Richards & Sons after July 24th, which is when he claims to have discovered, as a result of his due diligence investigation, that the information pertaining to Bellanca's accounts receivable and accounts payable on the May 30th balance sheet was inaccurate. He

24

testified, "When I started realizing the true financial situation was in July when they provided these other financial statements that we received, I think it was July 23, whatever that latest one was." Unofficial Trial Transcript, March 12, 2009..

The Court finds that reliance by Mr. Richards on the balance sheet to make advances of cash and extensions of credit to Bellanca through Richards & Sons after July 24th was unreasonable because he knew then that this document was inaccurate.

Similarly, his reliance on that balance sheet to make advances of cash and extensions of credit through Richards & Sons to Bellanca prior to that time was also unreasonable. Mr. Murphy testified that it would have been imprudent for Mr. Richards to have proceeded in reliance on the May 30th balance sheet without verifying the facts contained in it, and getting more details on Bellanca's receivables and payables, and doing additional due diligence.

Based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### F. Mr. Richards had Ample Reason to Doubt the Accuracy of the May 30th Balance Sheet

Because Richards & Sons had already advanced payroll cash and credit for materials to Bellanca on July 12th, Mr. Richards contention that Richards & Sons was still relying on the strength and accuracy of the balance sheet that he had acquired on June 5, 2007, in making the July 17th and 19th advances of cash and material to Bellanca is problematic. It should have at least become apparent to him by then that Bellanca was having problems collecting the accounts receivable that were listed on its May 30th balance sheet, because if it had been collecting those receivables it would not have needed to borrow money from Richards & Sons to stay afloat. The same would hold doubly true, of course, for the $51,429.75 in materials that Richards & Sons authorized Bellanca to purchase on its account on July 20, 2007.

Mr. Richards' claims that the accounts receivable aging summary and accounts payable aging summary, both dated July 23rd, which were obtained by him from Bellanca on July 24th prove conclusively, in his view, that the accounts receivable and accounts payable information on the May 30th balance sheet was false. Consequently, neither he nor Richards & Sons could have possibly been misled by that information on the balance sheet or have reasonably relied on it with respect to any of the cash advances and extensions of credit that Richards & Sons, at his direction, made to Bellanca after that date.

By virtue of his receipt of those July 23rd reports, Mr. Richards, by his own admission, knew and was fully aware on July 24th that the accounts receivable and accounts payable figures on the May 30th balance sheet had changed dramatically for the worse, and, therefore, could no longer be relied on for any purpose. That fact,

Case 08-00118-BGC    Doc 19    Filed 03/08/10    Entered 03/08/10 10:57:09    Desc Main
                    Document      Page 25 of 30

when combined with the fact that Richards & Sons had over the preceding 11 or 12 days had to advance money to Bellanca so that it could make payroll, and extend credit for it to buy materials, (without which it would have had to close its doors), provided Mr. Richards with ample reason to doubt and disregard the balance sheet and any other financial information previously provided to him by or about Bellanca.

Nevertheless, after receiving the revealing July 23rd reports on July 24th, Mr. Richards continued, through Richards & Sons, to advance money and extend credit for materials to Bellanca.  On July 26, 2007, and August 2, 2007, Richards & Sons issued checks for $12,000 and $10,265 to Bellanca to allow the latter to make payrolls. Plaintiff's Exhibit 6.  And between July 25, 2007, and August 10, 2007, Richards & Sons authorized purchases by Bellanca of materials totaling $82,299.47. Plaintiff's Exhibit 9. That course of conduct, of course, negates Mr. Richards claim that he relied on the May 30th balance sheet.

Even more telling for Mr. Richards' contention that he relied on the May 30th balance sheet in authorizing those post-July 24th material purchases by Bellanca on Richards & Sons credit is the fact that $33,026.14 of those purchases were authorized after August 2, 2007.  That date was the day he obtained the two additional documents that, according to him, also proved that the information on the May 30th balance sheet with respect to Bellanca's receivables and payables was false.  He said that his review of the "Bellanca Paving Inc. Collections Report as of August 2, 2007", Plaintiff's Exhibit 11, and the "Bellanca Paving Inc. Unpaid Bills Detail as of August 2, 2007", Plaintiff's Exhibit 12, left him "devastated."  He testified, "I realized that the information I had been provided to make my decisions on was not accurate at all, I was almost devastated, couldn't believe what I was reading."  Unofficial Trial Transcript, March 12, 2009. In contrast, those revelations did not dissuade him from allowing Bellanca to purchase $33,026.14 in materials on Richards & Sons account in the days following his receipt of those two documents.  Plaintiff's Exhibit 9.

In addition, Mr. Richards did not abandon his original arrangement with Mr. Odom, which was to purchase Bellanca's equipment, pay off its debts, move its business operations and employees, including Mr. Odom, into Academy.  Indeed, after Mr. Richards received the Bellanca financial reports on July 24th and August 2nd, during the first or second week of August 2007 Mr. Odom, with Mr. Richards' approval, moved all of Bellanca's equipment that was not being used on jobs to Richards & Sons yard. He also moved Bellanca's office furnishings and computer to Richards & Sons offices, and directed Ms. Lovejoy to report to work at Richards & Sons, which she did.

If Mr. Richards had in fact been relying on the May 30th balance sheet as his litmus, one would think that he would have changed course after he learned on July 24th that the document was false or inaccurate.  Consequently, his determination to complete the arrangement despite knowledge of that alleged falsity proves conclusively that he was not relying on that document at all, even for the purpose that it was apparently intended.  That purpose was to provide a framework or starting point for the

26

subsequent due diligence that both he and his accountant acknowledged was necessary and which he proceeded to conduct. And if he did not rely on the May 30th balance sheet for the purpose that it was provided to him, then his claim that he relied on it for a purpose that it was not intended, that is, in deciding to make substantial advances of cash and extensions of credit to Bellanca while he was doing his due diligence and prior to its completion, is implausible. Based on these actions, the Court finds that Mr. Richards' actions were contrary to the reasonable reliance requirement of section 523(a)(2)(B).

Based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

### G. The Equipment, Encumbrances and Cadence's Lien

Mr. Richards suggested at the trial that he was misled into believing that there was substantial equity, possibly $350,000, in Bellanca's equipment. He stated that was the reason for pursuing a deal with Mr. Odom after the June 5th meeting.

The equipment list provided to him by Mr. Stiff at or before the meeting lists 13 pieces of equipment and includes the year each was purchased and the value Mr. Odom ascribed to each. There was no information about encumbrances or security interests on the document prior to Mr. Richards' obtaining possession of it. He reviewed the list with Mr. Stiff and asked the latter which, if any, were encumbered by liens. According to Mr. Richards, Mr. Stiff told him that three stood as security for notes owed to Citicapital, HCA and Key Machinery, and that the amount due on those notes was $15,058, $25,952, and $29,172, for a total of $70,182.

The values assigned those pieces totaled $481,200. Mr. Richards subtracted $70,182 from that figure and determined, in his mind, there was about $350,000 in equity in all of the equipment. From that, he and Mr. Murphy thought it was a good idea to buy the equipment from Bellanca for $200,000 through a new company, that is Academy, which would be formed to carry on Bellanca's asphalt paving business. His assumption was that his investment loss exposure for the debts of Bellanca would be limited to $200,000, which initial investment would be protected by the value in the equipment. Furthermore, as explained by Mr. Murphy, by purchasing the equipment instead of buying into Bellanca, Mr. Richards would receive a tax advantage that would result in his actually paying only 40 cents on the dollar for the equipment.

In reality, however, Cadence's line of credit was secured by a blanket lien of all of Bellanca's assets, a fact Mr. Richards says was not revealed to him by Mr. Stiff at the June 5th meeting. He said he discovered it later from Mr. Stiff in late July when he supposedly received the disturbing revelations about Bellanca's payables and receivables. According to his testimony, that would have been on July 24th.

27

Even if Mr. Richards' was misinformed or uninformed with respect to the extent that Bellanca's equipment was encumbered, the results do not change. Mr. Richards was provided the information about the equipment and possible liens for the purpose of deciding whether he wanted to invest in Bellanca either as an equipment purchase or otherwise. Since he did not invest in Bellanca or invest in its equipment, he did not ipso facto rely on that information for the purpose that it was intended and therefore suffered no damages as a result of its being false, misleading, mistaken or otherwise, even if it were. Indeed, he has not requested damages as a result of the failure to complete the deal. In fact, the only damages Mr. Richards claims in this action are reimbursement for the money advances and repayment of the credit extended by Richards & Sons to Bellanca to keep it afloat while he conducted his due diligence investigation with respect to purchasing Bellanca's equipment and essentially taking over its business. The information about the equipment and possible liens was not provided to him at the June 5th meeting for use in deciding whether to advance money or to extend credit to Bellanca while he was deciding whether or not to invest in it. Therefore, he had no right to rely in fact on that information for that unintended purpose.

Furthermore, when asked to specifically state what written document forms the basis of his case, that Richards & Sons supposedly relied on to its detriment, and that he contends ultimately proved to be false, he stated, "Exhibit 1, the balance sheet as of May 30, 2007." Unofficial Trial Transcript, March 12, 2009. But the balance sheet merely lists the equipment in one area and the liabilities in another and does not indicate any relation between the two. It does not show which debts are secured or indicate whether the equipment is encumbered. It lists the Cadence line of credit, the Citicapital, HCA, and Key debts as well, but it does not indicate that any are secured or not. And it does not itemize the individual pieces of equipment. It shows only a generic category for "equipment" as part of the company's assets and shows the cumulative value of all equipment.

Because there is no information about what is or is not encumbered on the balance sheet, or how much of the equipment was encumbered, it was impossible for Mr. Richards to have known from examining this sheet what equipment, if any, was encumbered; or what debts, if any, were secured; or whether there was any equity in the equipment. Consequently it was impossible for him to have been misled that there was equity in Bellanca's equipment.

Moreover, the equipment list presented to Mr. Richards by Mr. Stiff on June 5th could not have misled Mr. Richards into believing that there were no encumbrances on Bellanca's equipment aside from the notes owed to Citicapital, HCA, and Key. That document neither lists nor describes any debts, creditors, or encumbrances. It merely lists pieces of equipment, the date each piece was acquired by Bellanca, and the value Mr. Odom placed on each piece. From that information, Mr. Richards could not have formed an opinion or impression about which pieces, if any, were encumbered; or what debts, if any, were secured; or whether there was any equity in the equipment or not. That document, therefore, could not have misled him into believing there was equity in the equipment.

Case 08-00118-BGC    Doc 19    Filed 03/08/10    Entered 03/08/10 10:57:09    Desc Main
Document       Page 28 of 30

What Mr. Richards said specifically was that Mr. Stiff told him that three of the pieces were encumbered and gave him the amounts owed on the three notes secured by those pieces. He wrote that information on the equipment list. To be fair, Mr. Stiff testified that those were the only encumbrances on the equipment that he knew about and there is no evidence that contradicts that testimony. Consequently, there is no evidence that Mr. Stiff intentionally misled Mr. Richards. Moreover, Mr. Richards did not say that he broached or discussed the subject with Mr. Odom of encumbrances on, debts secured by, or equity in the equipment. Therefore there is no evidence that Mr. Odom misled him with respect to those subjects in any of their meetings or conversations. In any event, and more significantly, anything said or not said by either Mr. Stiff, at the June 5th meeting or otherwise, or Mr. Odom, in his many conversations with Mr. Richards, on those subjects constitutes verbal communication which cannot form the basis of a section 523(a)(2)(B) action.

Also, when asked to state specifically what information on the balance sheet he relied on to his detriment and that he contends ultimately proved to be false, Mr. Richards stated, "That his payables and receivables that he was showing as Bellanca Paving were true and actual to what he expected to pay and receive over the next 30 days." Unofficial Trial Transcript, March 12, 2009. He did not mention the equipment, or the amount of equity in the equipment, or the amount or nature of encumbrances on the equipment. By his own admission, therefore, Mr. Richards did not rely to his detriment, or to the detriment of Richards & Sons, on any written statement provided to him by Mr. Odom in regard to the equipment.

In addition, Mr. Richards assertion that he did not learn about the Cadence lien until "late July" is undermined by statements made by Mr. Murphy. When asked on direct examination about the idea Mr. Richards and he had following the June 5th meeting, Mr. Murphy stated, "What we ended up doing was setting up a separate entity called Academy Paving, we were going to buy the assets of the company, that would give them the cash they needed to pay their payables and also to pay the line of credit off at Cadence Bank which was secured by the equipment." Unofficial Trial Transcript, March 12, 2009 (emphasis added). In addition, when asked about the equipment list presented by Mr. Stiff to Mr. Richards on June 5th, he stated, "what they were doing was estimating the value of the equipment because we were going to have to go borrow money from the bank to basically give them to pay their line of credit off and those numbers there are what they estimated of the fair value of equipment was." Unofficial Trial Transcript, March 12, 2009. Those statements reveal that early in the planning process, and probably at the June 5th meeting, Mr. Murphy knew that Cadence's line of credit was secured by the equipment in addition to the accounts receivable. And if he knew, it cannot be doubted that Mr. Richards knew as well. And if Mr. Richards knew it, he could not have relied in fact, or reasonably relied, on any statement, written or otherwise, to the contrary.

Based on these facts, the Court must conclude factually, and as a matter of law, that Mr. Richards did not reasonably rely on the information he contends was false.

## VI.  Conclusion

The evidence requires the conclusion that Mr. Odom did not commit the wrongs alleged by Richards & Sons in its complaint, and that the damages allegedly incurred by that entity were the result of its unreasonable reliance on things it should not have relied on.

There is more than a preponderance of the evidence that Mr. Odom did not mislead either Mr. Richards or Richards & Sons in any way, or that either Mr. Richards or Richards & Sons was misled in any way by anything done or said by Mr. Odom, anyone on his behalf, or any document that he may have produced or delivered to them.  Mr. Odom did not intend to or attempt to mislead either Mr. Richards or Richards & Sons in any way or ask or direct anyone else to do that for him.  There was no conduct of Mr. Odom, either individually, or through the use of Mr. Stiff, or any other person or entity, or any document, that falls within the prohibition of section 523(a)(2)(B), which is the legal basis of Mr. Richards' allegations.

Moreover, Richards & Sons did not prove that Mr. Odom owes any debt to it or Mr. Richards individually and the Court so concludes that he does not in fact owe any such debt.  In addition, notwithstanding the finding that there is no debt, if there were, any such liability to the plaintiff was included in and discharged by the order entered in the defendant's chapter 7 bankruptcy case on February 10, 2009.  Consequently, the relief requested by Richards & Sons in its complaint will be denied in a separate order which will be entered contemporaneously with this memorandum opinion.

Dated:  March 8, 2010              /s/Benjamin Cohen
                                   BENJAMIN COHEN
                                   United States Bankruptcy Judge


BC:sm